Our last case today is a consolidated matter. It's Dallas v. Cook v. Illinois State Board of Elections. The case numbers are 4160160, 4160161, and 4160162. For the appellate, we have Aaron Wieschar, and for the appellee, Michael Casper. Mr. Casper, you may proceed. May it please the Court, Mr. Casper. My name is Aaron Wieschar, and I represent the appellate, Dallas Cook. The question before this Court is whether the Illinois Constitution gives sitting judges who have been elected the choice of seeking re-election instead of following the retention process, when their intent is really to still stay on the bench for yet another term. The saga begins when three presently sitting judges in St. Clair County, either together or individually, decided to take it upon themselves to resign, and sent resignation letters to Chief Justice Garvin, announcing that resignation that they intended to take when their term runs out this November in 2016. And instead of running for retention, and by now they've also stipulated that... Let me ask, should we read anything into the fact that the Chief Justice of the Illinois Supreme Court accepted those with an effective date later this year, and therefore notified, I presume, the Secretary of State to certify the names on the ballot? Should we read anything into that? Not that I'm aware of, necessarily, Your Honor. It does create a vacancy, although you've read my brief, I think it's kind of an odd vacancy. It's a self-created vacancy, maybe in my own words. Well, could the Supreme Court have taken the position that the vacancy doesn't occur until the December date, when they no longer show up for work, versus them self-determining, it's going to be effective in December, I'm letting you know now, so you can certify to the Secretary of State that our positions are vacant and we can run for them. And it looks like the Supreme Court sort of acquiesced in that. Well, I've taken a similar stance in some prior arguments, as well, that this is a different type of vacancy or a different type of resignation. Almost it's prospective that they're creating their own date, a self-created vacancy, as opposed to a resignation now that they had taken last August and had walked away from their current positions, where it's a real vacancy that the Supreme Court then could have had the option of saying, oh, we need to do something to fill that vacancy. And maybe, for example, Judge Hayda will allow you to fill the vacancy, if you will, until the next general election or until the next judicial election. We found no authority for what these three judges are really doing, which is taking the position that there's a choice, that somehow the Illinois Constitution gives them a choice to, just because they say that they're eligible to run for it now, re-election, instead of running for retention. And so what they're doing is really campaigning with their own party, taking a partisan stance, if you will, and getting the benefit of running with their party, when really, in a retention ballot, once someone is elected to the bench, that you're removing yourselves from the normal political processes. You know, not taking a political stance and tending to be bipartisan. But here, they're taking a partisan stance and choosing to run with their party instead of remaining nonpartisan, just injecting themselves right back into politics. We think it's significant, because on the retention ballot, it's, you know, as all of you know, it's a special ballot. You know, it's separated from the rest of the ballot. It's a yes or no question. It's yes or no that, you know, you need to have 60% of that electorate in order to say yes, that they have the confidence in you that you are to remain on the bench for yet another term. Here, they're taking a position by saying, by running for re-election, of course, that all we need is a simple majority. We only need that simple 51%. What's bothersome is that why should they get the option of deciding what percentage of the electorate they think they need in order to stay on the bench? You know, effectively, our argument has been that they're taking power away from the minority, from those voters who could go to cast their ballot on election day and effectively choose no to their retention. Well, in theory, if no one runs against them, they just need one vote, right? At least at the primary level, that's right. All they need is one vote to be able to run and win the primary. And in this case, curiously, they were the only three of their party to run for the Democratic seats in the primary. Do two of them not have opposition in the general? That's correct. So they would only need one vote. That's correct. Whereas if they did the retention process, they'd need 60% of those voting. That's correct. So they're really taking power away from the people who've lost confidence in these three judges, making it easier upon themselves. It's also a constitutional guarantee to the electorate that they have a right. They have a right that's been taken away from them by their attempt to run for re-election by gaining a simple majority instead of requiring that 60% vote. It almost seems illogical that the framers of the Constitution would really intend that there is somehow now a choice of running for retention or re-election, particularly when they take so much time through the constitutional conventions to raise that threshold from what was a 50% even at retention in prior years in 1962, finally becoming a 60% requirement to be retained. We submit that there's nothing by any plain word meaning that gives them a choice to run for re-election instead of retention when they want to sit in office. And what's curious about this case, too, is that they're still sitting in office, running with their party, again, running for re-election as if they're running for the very first time. The objection filed by my client was at least based in part on Article VI, Section 12B of the Illinois Constitution, and in particular those words, not less than six months before the general election, preceding the expiration of this term, a judge who has been elected may file in the office of Secretary of State. And those words, we believe, who has been elected are of great importance when we're trying to understand the intent of the Constitution. What about the words may file? Yes, and the word may and may file is of great importance as well. They may file because this is not a situation where we say that they must file for retention, and it's because a judge does have this choice of saying that I don't want to be retained. I want to be able to walk away from my term, that when my term is over, I want to walk away from this. Or maybe they've submitted a prior resignation, so they're walking away from the office. So you think the may in the context you're using is simply there so that a judge won't think that they have no choice but to run for retention? Well, I think their no choice of running for retention is if they want to stay on the bench. The process to get there is that you may file for retention. It's not saying you have to file for retention because you have other choices to resign or to walk away at the end of your term when your term ends. It's not saying you may run for retention or you may, if you don't like the idea of running for retention, you may just run for re-election. It doesn't say that. Where does it say you can't do that? Well, you know, is that really the methodology that we're to have? And this is maybe a little overly simplistic in my mind, but there was a whole list of things that were wrong when I was a kid that my mom didn't have to necessarily remind me of when she left the house. They were just wrong. Okay, I'm going to have to stop you because it's a little bit different with mom and statutory instruction. Absolutely. Yes, you're right. The Constitution, and I said it's overly simplistic, but the Constitution is giving us some guidance as to what they may do. It's not by any stretch, by plain word meaning, say that you have a choice if you don't like the idea of running for retention, that you can go ahead and resign, pick your own resignation date, still sit in office, and run on a partisan ticket. It's just so you can keep your job, which is what they want to do. They want to keep their job for yet another term. Well, I guess my question would be, what about the language that talks about eligibility? What's the statutory construction of that? Yes, and I think we have to be able to read Section 11 in some type of conjunction with Section 12. However, Section 12A, though, really outlines that eligibility. We're talking about Section 11, which is these are the criteria if you want to be elected. When I read Section 12 as a whole and go through each section, A through D, one at a time, it makes it more clear when I'm reading Section A that you can become elected to a circuit or appellate or Supreme Court judge when you're eligible. Section 11 defines for us when you are eligible. I don't take disagreement with that. I think it's just kind of a distraction here in this case, the eligibility argument, because they were eligible in the first place. That's why they're there. That's why they're there now, because they were eligible in the first place. So eligibility, I don't think, is really the criteria here as we're looking for determining does the Constitution say that you have a choice of running for re-election versus if you want to stay on the bench and keep your seat, the process to get there is retention. And again, nothing in Article 12. Let me back up for one second. We talked about Section A. Section B outlines for us the word vacancy and when a vacancy is defined and when it's created. But then Section C is also of great importance to us as we read, again, Section 12 as a whole. And because Section 12C outlines when there is an appointment for when there's a vacancy. And I think this is of great importance by way of analogy that if the Supreme Court decides that someone's to be appointed under 12C to fill a vacancy because going back to our earlier hypothetical, let's say, for example, Judge Hayda had announced his resignation and left the courthouse, packed up his things and left, and now there's a true vacancy. Someone's not in that seat. And the Supreme Court appoints someone. When we get to the next judicial election, that person has been appointed, or the next general election, that person has been appointed, has the ability to run in the next general election. And it makes sense that he does because he wasn't elected. Again, when we look at Section D and read it in conjunction with 12C, 12D uses those words, who has been elected. What about if they put Hayda back in? They could do that. The Supreme Court could say, there's a vacancy here. You've announced your resignation. We're going to appoint you for the rest of this term for you to sit there until the next judicial or general election. That could happen. Yes, but then that would open up the opportunity because now he was appointed to be able to go and run in the general election as opposed to now when he's still sitting on the bench of being able to run in a partisan election when he has been elected to that seat because there's a true vacancy. The Supreme Court, in the case of O'Brien, which we've cited in our brief, we think is particularly helpful outlining a couple approaches. Two schemes by which one can be elected to the bench. First, it outlines the initial election process, which of course is a partisan race. And the second scheme is a nonpartisan election scheme, which is for the elected judges. But there's nothing that we've seen in case law, nor is there anything in the historical notes, anything in the Constitutional Convention transcripts that indicates that somehow a judge who's been elected can just continue to run as if he's eligible for the very first time over and over again. There's nothing that seems to take that first scheme approach as being an option over and over again just because he wants to. I know it's not binding, but I'm trying to remember the name of that federal case, and it wasn't the issue in the case, Lefkowitz? Yes, it's the Lefkowitz case. Yeah, there's some discussion about that. There is some discussion, but I think, you know, I've read the Lefkowitz case, and there's parts of it that I like and there's parts of it I don't like. But I will say this. When I go back and I try to look at where it cites to the Constitutional Convention, I've gone back and I've read those notes. And here's really what was being discussed at the Constitutional Convention, that it's foreseeable that someone in a subsequent election could come back and run in another race. However, Chairman Fay, though, was describing kind of something else. Really the idea that if you've lost your retention race, you could come back in theory and run again in a partisan race, but he had a hard time understanding how that would really happen or why that would ever happen. Because why would someone who's lost the retention race, you know, actually, how could they be foreseeable, how could they foreseeably actually get the nomination to run again when now they've lost the retention race? That's what he was talking about. So my issue with the Lefkowitz case is some of that has taken a little out of context as to what was really being discussed at the Convention. Again, retention and the need to have 60% of the electorate was put in place at the Constitutional Conventions for good reason, such as to make the process for selecting judges less political, to make a form of tenure to guarantee the independence of the judiciary, to strengthen the judiciary by creating a method for the electorate to remove those in whom they've lost confidence for one reason or another. The fact is that the majority at the Constitutional Convention felt the requirement of less than 60% would make it almost impossible to remove those judges in whom they've lost confidence. Some of the delegates even thought it would be more permissible to have a percentage that's higher than 60%. They want to ignore some of the historical notes, including this note, which says that judges who are incumbents on January 1, 1963 and thereafter would run against their own record and without party designation rather than against an adversary candidate in the appropriate general election. It's talking about sitting judges and what they are to do when the end of their term has come and they're wanting to remain on the bench. We'd submit that that note and the other historical notes, as well as the transcripts, just support our position. It only bolsters our position and our plain word meaning of Section 10. Counsel, do you agree that the historical notes and the debates, whatever, from the Constitutional Convention are irrelevant to us unless we find the language ambiguous? Well, I understand your position and understand that. This Court, yes, if it found it ambiguous, could look to those things as being more authoritative. I don't know that there's a true ambiguity here. With the possibility of your opinion... In your opening brief, you seem to suggest there's no ambiguity, but in your reply brief, you seem to suggest there is an ambiguity. Yes, I'm throwing it out as an alternative hypothetical that this Court could... At least in my mind, it's foreseeable this Court could find some kind of ambiguity. For example, the word may here, just in and of itself, could seem somewhat ambiguous as to exactly what it means. I don't think it's referring at all to the choice that a judge has of saying that I may run for re-election or I may run for retention, but rather the choice that I may run for retention if I so want to, or I can walk away. So there may be some ambiguity in that word. Alternatively, I've argued that is there ambiguity in reading the entire Section 12 as a whole? I don't know that there is. I think each section, as you read it, seems unambiguous. Even our case law seems to say that 12d is unambiguous, but the word may here continues as we've moved through this process to cause us problems. To the extent that there is ambiguity, you're correct. You could look at the historical notes and you could look at the Constitutional Convention transcripts and anything else that you felt was important to really understand the legislative intent. And if we don't find ambiguity, as Justice Turner indicated, then it is inappropriate for us to look at those. Would you agree? I don't know. Under the rules of statutory construction? Correct. I understand that, too. I still get hung up on the idea that the historical notes, though, offer us support even if there is no ambiguity. It only bolsters our argument as opposed to saying we're reading them to try to figure out what they were saying. Here, I think my distinction is that. They simply bolster our plain word meaning of the intent of Section 12d. We also submit that what's going on here is rather dangerous. There's many judges up and down the state that are running for retention. That may drastically change if what these three judges are doing is allowed to happen up and down the state. Who wouldn't want to just say, oh, well, it's a whole lot easier for me to go and run for re-election than it is for me to get 60 percent of the vote. Things haven't gone so well for me, so I'll just pick my own resignation date at the end of my term. I'm not going to move my things or pack them up from the courthouse because if I run with my party, I've got a much better chance of staying on the bench. It just seems real dangerous to me, particularly when we read 12d and the word may and what it means here of saying that you may run for retention or you may walk away. There's nothing in Section 12d that gives us a choice of running for retention or re-election. Finally, the judges have made a big to-do about partisanship and the political arguments that we've made, but it really seems true that what they're trying to do is politicize the judiciary. When we have such a dangerous situation before us of the abuses that we feel could happen to the Illinois Constitution, and here Justice Roberts, we think, had it right. If the judiciary becomes another political branch responsive to political pressures, it offers opportunity for these judges to, for lack of better words, to have their palms greased by those who are their closest to in their county. If they're responsive to political pressures, then we have all branches responsive to political pressures, and that's certainly not what our Constitution intended. Counsel, you are out of time, but you will have rebuttal. Thank you. Mr. Casper. Good afternoon. Justice Turner, Justice Holder-White, Justice Harrington, counsel. Michael Casper. I represent the three appellee candidates in the matter, not the State Board of Elections. Mr. Weishar is incorrect when he stated at the beginning of his presentation that there is no authority that allows the judges to run in the primary election. Section 12A of the Illinois Constitution specifically says, quote, a person eligible may cause, may seek election to the judiciary through the primary election. A person eligible, that's the term that 12A uses. Where do you find the definition of 12A? That comes in Section 11. Section 11 specifically says, quote, no person will be eligible, same word, eligible, unless they are a citizen of the United States, a licensed attorney, and a resident of the unit that selects them, in this case the circuit. There is no dispute that these three candidates meet the three eligibility requirement in Section 11. They're eligible for the office. Mr. Weishar just said, well, they were eligible at the beginning when they first ran. That doesn't matter. The question is whether they're eligible now. They meet those three requirements. Therefore, because they meet the three requirements under Section 11, they have a constitutional right under Section 12A to seek to have their name placed on the primary ballot, which is exactly what they did. So Section 12D, the retention process, provides for an alternative method for a sitting judge. I don't disagree with that. These judges could have sought retention. That section, Section 12B, provides that a judge who has been elected may seek to succeed themselves through the retention process. May seek to succeed themselves. The word may appears twice, once in 12A and once in 12D. They're not mutually exclusive. Nothing suggests that they are. There is no case, there is no note, there is no statute that suggests that these two routes are mutually exclusive. Mr. Weishar said during his presentation, and he quotes extensively in his brief, the discussion about the retention threshold, whether the vote should be 50% or 60% or some other number, at length. Wouldn't this have come up somewhere if Section 12D was designed to somehow limit 12A or 11? If that was somehow to exclude someone who was affected by 12D, could then be excluded from 11 and thereby 12A? Wouldn't someone during the Constitutional Convention have said that? Wouldn't some case, wouldn't some judge have ever said that? No one has ever adopted that position. Justice Holder-White, you mentioned the Lefkowitz case. I happen to like all of the Lefkowitz case, not just part of it. In that case, that case was a judge. Judge Lefkowitz, there was somebody who ran afoul of the retention process. He came up short of the retention threshold, filed a lawsuit saying that the heightened threshold was unconstitutional. Three-judge federal court panel rejected that argument and upheld the 60% threshold. In doing so, Judge Marshall, writing for the three-judge court, said, Illinois judges who are eligible for retention need not seek retention. They may seek re-election. As Mr. Weissart said, it wasn't the holding of the case that was above the threshold. But that's what the three-judge federal court concluded. Similarly, in a case that Mr. Weissart didn't cite in either of his briefs, the Maddox case, that's the closest case the Illinois Supreme Court has ever come to this question. That question dealt with the mandatory retirement age, where the Supreme Court held the mandatory retirement age for judges that was enacted by statute was unconstitutional as a violation of the Equal Protection Act. In that case, the conclusion of the case, the majority was, that someone over the age of 75, which was the statutory retirement age, could seek re-election or retention. That it was unconstitutional. Justice Carmeier, in his dissenting opinion, would have upheld the mandatory retirement age to exclude a judge from seeking retention. But he concluded, that doesn't mean that that judge can no longer be a judge. That judge could still seek re-election through an election process, through 12A. That's the only pronouncement from a Supreme Court justice on this question. So there are two judicial pronouncements on this question that support what these judges have done. In addition, the statute that was passed by the General Assembly to implement this process, the retention process, that's Section 7A1 of the Election Code, which I cited in my briefs, says that a judge who has been elected and who seeks retention must file these forms with the Secretary of State, etc. The word and, and who seeks retention. These judges are not seeking retention. So therefore, that statute, that process does not apply to them. So the real question is whether there is any, any theory under which a Section 12 somehow limits the rights of every person eligible under Section 11 to seek election to the judiciary under Section 12A. And there's just simply no authority for that at all. To sort of take up the example that Mr. Weisshardt started on, let's say Mom says to the student, every day after school you may have an apple. On days of tests, you may have a cookie. So Section 11, being the eligibility requirement, in my example, is going to school. You're a citizen, you're a licensed attorney, and you are a resident. That's the equivalent of going to school. You may have a cookie every single day. 12A, you may seek to have your name on the ballot. On test days, a little bit narrower, you may have a cookie. On test days, that doesn't mean you can't have an apple. If that's what you want, it means you may have an apple or you may have a cookie because you meet both. In this case, these candidates meet both. They may seek retention under 12B or they may seek election under 12A. It can't be any clearer. There's no ambiguity about this. They meet these requirements. The Maddox case that I talk about in my brief specifically says when the constitutional provisions are unambiguous, then there's no need to look at the debate. So I think that closes the question. The word may appears both. They're eligible under both. They can pursue both avenues. But even if you find that, there is nothing in this lengthy constitutional debate that even suggests that someone who is an elected judge may not seek election through 12A. 12D says what an elected judge may do. It does not say what he may not do. And so for that reason, I believe that the decision of the state board of elections, a hearing officer was correct. The state board split on the question. And the circuit court, I believe that decision was correct and should be affirmed. The other arguments that Mr. Weissar relies upon, the judges should not be politicians, things of that nature. I mean, judges are politicians under our constitutional scheme. And that's just a fact that we've lived with for the last 45 years, and that's not going to change. Judges seek election to the seats that they hold all the time. Judges assigned to this court by the Supreme Court seek election to the seats that they're currently sitting in all the time. Justices Lampkin and Justice Burke are doing it right now in the first district. Justice Tice was assigned to the Supreme Court and ran for that seat as a sitting Supreme Court judge. Appointed circuit court judges run for the seats that they're holding in every single election. And in fact, if Mr. Weissar gets his way, that's exactly what will happen. There will be vacancies because no one will be elected because there's no candidates in two of the races. The Supreme Court then will have the right to appoint someone who presumably will have to run in the next election. So judges run for the seats that they're holding all the time under our constitutional scheme. And there's nothing improper about that. There's nothing impermissible. In fact, what Mr. Weissar is really saying is he's attacking judicial elections as a whole. And that's a debatable question, but that's not our constitutional scheme. The fact that the retention ballot is a separate ballot has absolutely nothing to do with the eligibility of the candidates who appear on it. The separate ballot is designed to alert the voter as to why there is no opposition, why there's only one candidate, not who that candidate is and what that candidate's eligibility are. The O'Brien case that Mr. Weissar talks about actually supports my position, I believe. That was the case that struck down the statute that required judges seeking retention to file the retention form 12 months prior to the general election, whereas Section 12D of the Constitution clearly says six months. So not surprisingly, the Supreme Court found that to be unconstitutional, an unconstitutional extension of the period in which judges had to make their decision. In finding that, the Supreme Court came to the very unremarkable decision that the Constitution means exactly what it says. That's exactly what is the case in this case. The Constitution means exactly what it says. A person eligible, who meets the three eligibility requirements, may seek judicial election at the primary election. That's what it means. There's no dispute that these three candidates meet those eligibility requirements. And then on this question of the voters and whether or not the voters are harmed by any of this or all that, I find it hard to believe that a system that provides for more democracy rather than less is harmful to the voters. The voters get more choices. They get two whacks at these candidates, not just one. These candidates have to win the primary election. Then they have to win the general election. That gives the voters more options. Candidates can run against them in the primary election. They can run against them as a different party in the general election. Or they can run as an independent candidate or a non-partisan candidate, a new party candidate. So there's all kinds of options that this methodology provides to the voters that inures to the benefit of the voters. Now, does this inure to their benefit? I presume that it does to the candidates' benefits. I've represented a lot of candidates. None of them have ever said, well, I'm going to take the more difficult road. But that doesn't make it unconstitutional. I believe that in this case the Constitution is quite clear. An eligible person under Section 11 may seek election at the primary election. That's exactly what these people are. That's exactly what they did. The Constitution specifically grants them that right. And I don't believe that this court should take that right away. Finally, Mr. Weissard didn't talk about this. This case is moot. I don't believe there's any question about that. The relief that Mr. Cook sought in the petition that he filed with the State Board of Elections was that these candidates' names not appear on the primary ballot. That's obviously no longer possible. The primary happened three months ago. So the relief that they are asking for can no longer be granted. So the case is moot. The question before the court is whether or not the public interest exception to the mootness doctrine ought to apply in this case. The public interest doctrine is a seminal case on this question in terms of election cases. It's the Sincus case, C-I-N-U-S, that I cite in my brief. There's three elements to the public interest exception, whether the case is one of a public nature. I concede that this is. The Supreme Court has said that election cases are always a case of public nature. Whether an authoritative determination or resolution is necessary. And then whether or not the question is likely to recur. This is the first time this case has ever come up in 45 years under our constitutional scheme. That hardly qualifies as one that is likely to recur. For that reason, I suggest that you conclude that the public interest exception to the mootness doctrine does not apply. The case should be dismissed. I'm happy to take any questions otherwise. Counsel, I see none. Thank you for your argument. This is a rebuttal. Thank you, Mr. Casper. I find it just interesting for what it's worth that the two lead-off cases, of course, have no authority. This Court has no real interest in those two cases by them being persuasive of any kind. Certainly, the Lefkowitz case is a federal district case, which we talked about already. And then, interestingly, that the candidates are relying upon the Maddox case, but really the dissent of the Maddox case. The Maddox case then, of course, Judge Carmeier was quoting from the Anangas case, which I think we have both looked to in some briefing of this matter, which was overturned by the Maddox case. So that's curious to me that we've got that kind of persuasive authority. Again, I want to reiterate that I think we need to read Section 12 as a whole to try to understand the intent here. And again, I didn't mention this case in my initial argument, but the follow-up company case, I think, is important too. And we're talking about trying to understand Section 12 first. And then we've talked a little bit about historical notes and the transcripts to the Constitution. And it says, in construing the meaning of a constitutional provision, it's appropriate and helpful to examine it in light of the history and condition of the times, and the particular problem which the Convention sought to address by incorporating the question and provision. It seems appropriate here when we're looking to Section 12D and trying to understand really what was set out by it in its use of the word may with regard to retention. And again, I go back and I have a hard time reading Section 12 as a whole and trying to say that somehow when I read it, by its plain word meaning that a candidate is given a choice of running for retention or running for election, nowhere does it say that there's a choice. I agree with Mr. Casper that the word may is used, and it's used in both Section A and Section D, but there's no correlation there between A and D to say, well, here you have a choice of running for either election or retention. Nothing says that. And we've talked about this, well, it's never happened before in 45 years. Well, it's bound to happen now, and it's going to be coming up, because people up and down the state are going to be doing it. And it's happened three times in this situation. Is that just by coincidence? I don't think it is. And it's happened again. It happened once previously in St. Clair County. Here's four instances in St. Clair County. Nobody took any legal action with regard to it, but Judge Quito did the exact same thing. Just because Judge Quito did it doesn't make it right now. And with regard to mootness, we would disagree. There is policy perspectives here. This is the exact same issue, the exact same issue before this Court that existed at the primary election. There was only each of the three candidates here running on the Democratic ticket. That's no different than what it is today. So we would disagree that there's anything about mootness. And as far as, it still comes down to choice. And they are deciding for themselves what percentage of the electorate they need to get elected. Now, can that be right? It's just not. That's all I have. Okay. Thank you, Mr. Weisshaar. Thank you, Mr. Casper. The case is submitted. Court stands in recess until further call.